IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

ESTATE OF JESSE JENSON, by and through its personal representative, Sheila Constable,

    Plaintiff.

v.

CAROLINE PERSICHETTI; and
TOWN OF LASALLE, COLORADO

    Defendants.

_____

**COMPLAINT AND JURY DEMAND**
_____

    Plaintiff, the Estate of Jesse Jenson, through its attorneys, Raymond K. Bryant, of the Civil Rights Litigation Group, PLLC and Steven T. Mandelaris, of Mandelaris Law, LLC, hereby submits this Complaint and Jury Demand, and alleges as follows:

**INTRODUCTION**

    1.    This is an excessive force action, seeking justice for the unnecessary shooting death of an unarmed off-duty police officer, at the hands of an on-duty LaSalle Police Officer, after the off-duty officer joined in to assist in a multi-jurisdictional car chase.

    2.    After a citizen observer called in a REDDI report regarding a female drunk driver in a Silver Jeep Liberty that was driving erratically at high rates of speed, multiple jurisdictions put out "Be-On-the-Look Out" calls (BOLOs) and requests for assistance in pursuit of the vehicle. Officers from Fort Lupton, Platteville, LaSalle, and Weld County responded. Police vehicles took turns pursuing the vehicle in attempt to stop it as it passed from jurisdiction to jurisdiction. Off-

duty Adams County Deputy Jesse Jenson was driving near the pursuit as it passed from Ft. Lupton to Platteville on Highway 85, and he joined in to assist behind Ft. Lupton officers. LaSalle Police officer Caroline Persichetti joined in the chase last and mistook Jenson for an aggressor, after Jenson had taken point in the chase when other police vehicles discontinued their pursuit. When Defendant Persichetti caught up to Jenson and turned her police lights on behind him, Jenson stopped, got out of his vehicle, and walked toward her in attempt to communicate with her. As Jenson walked toward her, waiving his open and empty hands in the air in front of him, Persichetti shot him in the head without warning.

3. Defendant Persichetti has claimed self-defense for the killing, but her account of the incident is riddled with inconsistencies, including how deadly force could be justified on any person – police officer or not – when Jenson showed no signs of being armed. Video surveillance from a nearby gas station shows that Jenson did not engage in any threatening behavior toward her – certainly not the type of conduct that could reasonably be perceived as presenting a threat of serious bodily injury and/or death (the standard necessary to justify shooting). Persichetti clearly overreacted in a rash, pre-mature manner, without properly assessing the situation.

4. Defendant Persichetti's rash and unreasonable behavior likely followed because she was emotionally unfit for duty. During a prior police incident months earlier, Persichetti was dragged by a different suspect vehicle during a traffic stop, which she never emotionally recovered from. The Town of LaSalle had policies that recognized officers who suffer from such severe stresses/shocks may not be fit for duty and that supervisors had a duty to ensure that officers go through therapy/counseling, rehabilitation, psychological assessment, daily stress recognition monitoring, re-training, and re-entry programs so that they would be fit for duty. However, after

being notified of the incident, neither the Chief of Police nor Persichetti's supervisors required Persichetti to follow the policy. Even though LaSalle PD officers have the highest rate of police shootings in the state[1], the department engaged in a custom/practice of never requiring its officers to follow the policy. As a result, Persichetti did not get therapy/counseling and was not certified fit to return for duty; she was left in an emotionally unstable condition that was prone to be triggered. Predictably, Persichetti misperceived the situation involving Jenson, failed to apply standard police force training to de-escalate and/or use less-lethal options, and overreacted by leaping to the use of deadly-force when it was not warranted.

5. Jesse Jenson's widow and Longmont Police Officer, Sheila Constable, as representative of the estate, seeks justice for the unnecessary killing of her spouse and a change to departmental training and oversight to ensure that neither Defendant Persichetti or other LaSalle officers kill again without justification.

## JURISDICTION AND VENUE

6. Plaintiff's claims are brought pursuant to 42 U.S.C. §1983 and the Constitution and laws of the United States.

7. This Court has jurisdiction of the subject matter pursuant to 28 U.S.C. §1331.

8. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) because all the events alleged herein occurred in the State of Colorado.

9. Jurisdiction supporting the Plaintiff's claim for attorney's fees and costs is conferred by 42 U.S.C. §1988.

---

[1] https://www.cpr.org/2020/01/31/meth-guns-aggressive-tactics-combine-to-give-colorado-one-of-nations-highest-police-shooting-rates/

## PARTIES

10. Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

11. Plaintiff, Jesse Jenson, at all times relevant to this Complaint, was a resident of the State of Colorado and an off-duty deputy of the Adams County Sheriff's Office. He is survived by his wife, Sheila Constable, who is the appointed personal representative of the Estate of Jesse Jenson.

12. Defendant Caroline Persichetti was at all times relevant to this Complaint employed as a police officer for Defendant Town of LaSalle, Colorado. Defendant Persichetti was acting under color of law in her capacity as a police officer at the time of the shooting. She is herein identified in her individual capacity.

13. Defendant Town of LaSalle, Colorado is a Colorado municipality, established under the laws of Colorado. Defendant Town of LaSalle is responsible for the policies, practices, supervision, training, and final decision-making of the LaSalle Police Department and its officers. Defendant Town of LaSalle was at all times relevant to this Complaint the employer of Defendant Persichetti and in control of supervision and oversight of its department police officers during their tenure with the police department.

## BACKGROUND FACTS

14. Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

15. On January 16, 2019, near the intersection of highway 470 and highway 85, a 911 caller reported that an unknown driver in a Silver Jeep Liberty appeared to be driving erratically

4

and may be drunk driving. The driver cut off another driver at a high rate of speed, a swerved across lanes of traffic, merging onto highway 85 in a reckless manner.

16. Ft. Lupton police were the first to respond, putting out a BOLO and requests for multi-agency assistance while in pursuit of the vehicle.

17. Thereafter, multiple officers from surrounding jurisdictions engaged the driver in a high-speed pursuit, driving north on highway 85 toward Greeley at speeds of approximately 90-100 mph.

18. Officers pursued the Silver Jeep Liberty for approximately 10 miles before reaching Platteville on highway 85.

19. Off-duty Adams County Deputy, Jesse Jenson, was an "always on" type of officer, off-duty and driving in his personal vehicle, a green Toyota 4-Runner, near the area around County Road 52 and Highway 85.

20. After officers issued the BOLO and requests for agency assistance, Deputy Jenson joined the pursuit, following behind the Fort Lupton police vehicles as they raced north on Highway 85 past County Road 66.

21. Officers from multiple jurisdictions, including Fort Lupton and Weld County relayed that officers should be aware that the unknown dark-colored 4-Runner had joined in the pursuit.

22. Ft. Lupton called off its pursuit as the Silver Jeep Liberty charged through Platteville. As the Ft. Lupton officers peeled off, multiple officers saw Plaintiff's vehicle continue behind the Silver Jeep Liberty.

23. Platteville officers joined the pursuit behind Deputy Jenson's 4-Runner for only a couple of minutes before Platteville PD told its officers to call off its pursuit and to follow at a distance, as the Silver Jeep Liberty passed through town.

24. At that point, Deputy Jenson's 4-Runner was left to purse immediately behind the Silver Jeep Liberty. It was the only vehicle providing continuity in the pursuit of the Silver Jeep Liberty at that time.

25. Over the course of the pursuit, officers and/or dispatch reported that the Silver Jeep Liberty looked like it was weaving wildly and running other drivers off the road.

26. The 4-Runner was not reported to have been the target vehicle. At no time did dispatch report the green/dark-colored 4-Runner was driving wildly or dangerously, other than that it was following the Silver Jeep Liberty at high rate of speed.

27. LaSalle Officers, including Defendant Caroline Persichetti and Officer Miller, listened to the radio traffic of the pursuit, from at least Fort Lupton onward, as the pursuit led officers north toward the Town of LaSalle. Each officer heard that the Silver Jeep Liberty was the vehicle being pursued for failing to yield and/or driving erratically.

28. Neither of the officers heard any information indicating that the 4-Runner was dangerous or otherwise needed to be stopped.

29. Officer and supervisor Miller contacted Officer Defendant Persichetti and discussed the pursuit of the Silver Jeep Liberty. Together they decided on a plan, including that Officer Miller would drop a spike strip on the road in front of the Jeep Liberty, and Officer Persichetti would pursue from behind.

30. Officer Persichetti waited for the two vehicles to pass her and then started out her pursuit, turning on her police lights and trailing behind the two vehicles at least a quarter of a mile.

31. The Silver Jeep Liberty continued, eventually striking the spike strip, which flattened its tires. The vehicle continued driving on its rims until Weld County officers eventually caught up with the vehicle and arrested the driver.

32. Meanwhile, Deputy Jenson in the 4-Runner stopped its pursuit and came to a stop at a stoplight.

33. Defendant Officer Persichetti finally caught up to Deputy Jenson's 4-Runner while it was stopped at the stop light.

34. As Defendant Officer Persichetti approached the stoplight, with emergency lights on, the stoplight turned green and the vehicles that were stopped, including the 4-Runner, began moving forward a few feet.

35. As Defendant Persichetti's vehicle got closer to the 4-Runner, pulling up immediately behind it in a manner that made it appear that the police vehicle intended to stop the 4-Runner, Jenson and the 4-Runner stopped.

36. This was the first time during the pursuit that any police vehicle had pulled up immediately behind the 4-Runner in a manner that made it appear that an officer wished to stop/detain the 4-Runner.

37. Defendant Persichetti stopped her police vehicle approximately 20-25 feet behind Jenson's 4-Runner, at slight angle, so that she would have a complete view of Jenson.

38. Absent-mindedly, Persichetti placed the police vehicle into neutral, instead of park.

39. Deputy Jenson stepped out of his vehicle in a manner that exposed his non-threatening, open and empty hands to the officer.

40. Deputy Jenson had on a green military shirt, blue-jeans, and black combat boots, like many former-military men in law enforcement dressed when off-duty.

41. Defendant Persichetti saw Jenson get out of his vehicle and expose his open and empty hands. She had no reason to believe he was armed.

42. Persichetti got out of her police vehicle and began to reach for her Taser, but instead changed her mind and drew her firearm.

43. She squatted down behind her open car door, which supplied her with automatic cover and protection, and she pointed her firearm at Jenson.

44. Deputy Jenson took approximately four steps, in a walking pace, straight toward Defendant Persichetti, before reaching the back quarter-panel/bumper of his vehicle, which walk consisted of approximately three seconds.

45. During this time, he visibly moved his open hands in front of his body, above his waist, in an apparent attempt to communicate with Defendant Persichetti.

46. During this time, Deputy Jenson did not make any furtive movements that could reasonably have been construed to have represented a threat to the officer.

47. During this time, Deputy Jenson did not say anything that could reasonably have been construed to have been a threat to the officer.

48. During this time, Defendant Persichetti did not provide any commands or warnings indicating that she could or would use deadly force against Jenson.

49. Defendant Persichetti provided no reasonable opportunity to understand what Deputy Jenson was attempting to communicate, nor for Deputy Jenson to understand that she was contemplating deadly force against him.

50. Within the three-second period, as Deputy Jenson reached the back quarter-panel/bumper of his vehicle, and while Deputy Jenson was at least 15-20 feet away from Persichetti, she fired her weapon, striking Deputy Jenson in the head.

51. Deputy Jenson dropped to his knees and fell forward onto the ground.

52. Just before she pulled the trigger, LaSalle Officer David Miller drove up beside Defendant Persichetti, and saw Jenson walking toward her. He did not hear Persichetti make any attempt to communicate with Jenson before she pulled the trigger.

53. At the same time, Defendant Persichetti's vehicle, which Persichetti had placed into neutral instead of park moved forward toward Deputy Jenson's body. Persichetti quickly jumped in to stop the vehicle.

54. Officer Miller ran around the back of his vehicle to meet Defendant Persichetti, where Persichetti said to Officer Miller, "it was me," and "he wouldn't take his hands out of his pocket."

55. Deputy Jenson, of course, had not had his hands in his pocket at any time Defendant Persichetti observed him.

56. Deputy Jenson's hands were always out in front of him and/or to his side, above his waist, and visible to the officer.

57. Defendant Persichetti appeared obviously upset, overwhelmed, and had lost control of herself. She hyperventilated and had difficulty communicating.

58. Officer Miller and/or another officer that arrived on scene performed CPR on Jenson.

59. Deputy Jenson was taken to the hospital in critical condition.

60. Deputy Jenson died shortly thereafter from the gunshot wound.

61. Afterward, during interviews pertaining to the incident, Defendant Persichetti indicated that a prior police incident caused her to react differently than she was trained. She described having been "dragged" by a suspect and/or suspect vehicle months before her interaction with Jenson, which caused her to fear what might happen with Jenson, before interacting with him.

62. During the interviews, Defendant Persichetti revealed irrational subjective thoughts about the level of danger she was in, which conflicted with the evidence, including, *inter alia*:

   a. that she imagined Jenson must have been armed, even though he showed no signs of having a weapon.

   b. Persichetti imagined that Jenson approached her like a "Terminator" who she was convinced was intent to kill her, without any evidence that Jenson had the means, opportunity or desire to harm her in any way.

   c. Persichetti described that she felt Jenson could have reached out and grabbed her weapon from her, even though Jenson was still at least 15 feet away from her when she fired and had only walked 4 steps, over the course of 3 seconds to get that far.

63. As a result of the prior "dragging" incident, she suffered a traumatic episode, and was in a vulnerable mental state at the time she was deployed on the night of the incident, which caused her to be overly sensitive to subjectively perceived danger, likely to overreact under stress,

and unable to reliably perform objective and/or reasonable assessments necessary for the application of constitutionally-limited force.

64. The Town of LaSalle, through supervising officer Miller and the police department's Chief of Police, were aware of the traumatic incident that preceded the Jenson incident and Officer Persichetti's vulnerable mental state before the shooting.

65. The department, Supervisor Miller, and the Chief of Police, knew or should have reasonably known that officers who suffer from such on-the-job trauma should be provided therapy/counseling, rehabilitation, and should be provided proper psychological assessments and/or retraining/re-certification before being fit for return to the field, where they would be exposed to members of the public.

66. The LaSalle Police department had "Critical Incident" policies in place that recognized police officers who confronted stressful events could develop emotional disorders and required assistance to emotionally cope and recover in order to be fit for duty again.

67. The policies recognized that post-traumatic stress disorders may arise from a variety of stressful events and that they may be hidden by officers subject to them.

68. The policies required psychological counseling and evaluation, daily stress recognition monitoring, re-training and re-entry supervision by an FTO, and that officers be declared mentally fit for duty before being returned to duty.

69. However, the Town of LaSalle, through Supervisor Miller and the LaSalle Chief of Police, unreasonably failed to supervise Defendant Persichetti after the dragging incident to ensure that Officer Persichetti had been provided therapy/counseling, rehabilitation, psychological

assessment, and/or preparation necessary to ensure she fully recovered from the preceding incident, and was fit for duty.

70. The Town of LaSalle, through LaSalle Chief of Police Harvey, engaged in a custom/practice of failing to require officers to go through the steps dictated by the policy, in spite of the obvious dangers such emotionally compromised officers would thereafter represent to the public without proper rehabilitation, assessment, observation, and fitness evaluations.

71. LaSalle officers shot and killed four people within the last six years, which represents the highest officer-involved shooting rate in the state of Colorado.[2] After each of those incidents, including the shooting incident involving Jenson, none of the involved officers were required to follow the steps described in the critical incident policy.

72. As a result of her prior trauma, and the Police Department's failures to provide counseling/therapy, rehabilitate, assessments, and/or to otherwise prepare its officers, including Persichetti, for further duty before placing them back in the field, Defendant Persichetti did not receive counseling and was not prepared to handle another serious incident at the time she engaged in the incident involving Jenson.

73. Persichetti did not view the circumstances she was confronted with involving Jenson as a reasonably well-trained officer should. She failed to appropriately apply facts, such as that Mr. Jenson was visibly unarmed. She overreacted when Deputy Jenson merely walked toward her, imagining that he approached like a "Terminator." She claimed that she felt Jenson could have reached out and grabbed her gun at the time of the shooting, despite the fact that Jenson was at

---

[2] https://www.cpr.org/2020/01/31/meth-guns-aggressive-tactics-combine-to-give-colorado-one-of-nations-highest-police-shooting-rates/

least 15 feet away and she had control over how/when she exposed her weapon n to Jenson. She claimed that she was certain Jenson was going to kill her, without any evidence that Jenson had the means, opportunity or desire to harm her in any way.

74. Defendant Persichetti allowed her subjective fear of the circumstances to overcome her, and she overreacted and used force above and beyond that objectively justified by the circumstances.

75. The actions and omissions of the Town/Police Department, and Defendant Persichetti's responses to her subjective and unreasonable fears, ultimately led to her discharging her firearm without objective justification.

## FIRST CLAIM FOR RELIEF
### 42 U.S.C. §1983 – Excessive Force – Deadly Force
(*Against Defendant Persichetti*)

76. Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

77. Defendant Persichetti intentionally and knowingly applied deadly force against Jesse Jenson, by shooting him in the head and killing him.

78. At the time the Defendant officer fired her weapon, Jesse Jenson did not pose a threat of death or serious bodily harm to the officer, or to anyone else. Deputy Jenson was visibly unarmed, with his open and empty hands in front of him, moving them in attempt to communicate, and had merely walked forward, four steps, at a non-threatening pace.

79. At the time of the shooting, Defendant Persichetti had taken cover and was protected by her vehicle door.

80. At the time of the shooting, Defendant Persichetti failed to identify herself as police officer, failed to provide warnings that she might use deadly force, and failed to utilize less-lethal means of de-escalating and/or controlling the situation, despite having an opportunity to do so.

81. At the time of the shooting, Defendant Persichetti had listened to the police traffic regarding the pursuit and knew or should have reasonably known that Jenson was not the dangerous vehicle that the officers had cause to pursue during the 20-30 mile pursuit preceding her involvement.

82. Persichetti knew or should have known that Jenson had joined the pursuit halfway through and was more likely attempting to provide support as opposed to representing a danger.

83. Even if Persichetti was justified in using some level of force during the encounter, the quantum of deadly force used went beyond that which could be considered reasonably justifiable under the circumstances.

84. As such, the use of deadly force by the Defendant Officer under these circumstances was objectively unreasonable.

85. The actions as described herein of the Defendant Officers, while acting under color of state law, deprived Decedent Jenson of the rights, privileges and liberties secured by the Constitution of the United States of America, including the right to freedom from unreasonable seizure as guaranteed by the Fourth Amendment to the Constitution of the United States of America, made actionable pursuant to 42 U.S.C. §1983.

86. Mr. Jenson, through his estate, has suffered natural and expected damages stemming from the shooting, including pain and suffering and ultimately his death, the proximate cause of which, were the actions of the Defendant Officer.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. §1983 – Municipal Custom/Practice and Failure to Supervise**
**(Against Defendant Town of LaSalle)**

87. Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

88. Not long before this incident, Defendant Persichetti had been involved in a different, serious police incident, in which she was "dragged" by a suspect police car.

89. As a result, she suffered a traumatic episode which likely caused her to be overly sensitive to subjectively perceived danger, likely to overreact under stress, and unable to reliably perform objective and/or reasonable assessments necessary for the application of constitutionally-limited force.

90. The Town of LaSalle, through supervising officer Miller and the police department's Chief of Police, was aware of the traumatic incident and Officer Persichetti's vulnerable mental state.

91. The department, Supervisor Miller, and the Chief of police, knew or should have reasonably known that officers who suffer from such on-the-job trauma should be provided therapy/counseling, rehabilitation, and should be provided proper psychological assessments and/or training/re-certification before being returned to the field, where they would, predictably, be exposed to members of the public.

92. Use of force incidents that have the capacity to cause lasting trauma to police officers are common in world of law enforcement/policing, are known to commonly reoccur, and should be reasonably anticipated as events that require appropriate prophylactic measures to ensure

15

officers who go through such incidents are properly fit for duty, lest they create a danger to the public.

93. In fact, the Town of LaSalle had adopted policies that recognized Post-Traumatic-Stress-Disorder could result from stressful/shocking incidents, and prescribed steps to be taken by Persichetti, supervisors and the Chief of Police before rendering her fit for duty.

94. The Town of LaSalle, including the Chief of Police, Supervisors, and Persichetti all had responsibilities to ensure that Officer Persichetti had been provided counseling and evaluation, daily stress recognition monitoring, re-training and re-entry supervision and be assessed to ensure she fully recovered from the preceding incident and was fit for duty.

95. However, The Town of LaSalle, including the Chief of Police, Supervisors, and Persichetti failed to ensure that Defendant Persichetti went through the proper steps and/or was emotionally fit for duty following the dragging incident, which left her emotionally unfit for duty and likely to be triggered.

96. The Town's conduct was in conformity with a faulty custom/practice of the department, which did not enforce the policy, and did not require officers to go through the steps necessary to ensure its officers were emotionally capable, reliable, and fit for duty. Instead, the failure to impose the policy and/or the failure to supervise its officers who were involved in stressful and/or traumatic events left the officers vulnerable to PTSD and/or other emotional disorders, which limited their ability to process and respond as reasonable police officers.

97. As a result of her prior trauma, and the Police Department's failures to provide counseling/therapy, rehabilitate, assessments, and/or to otherwise prepare Persichetti for further

duty before placing her in the field, Defendant Persichetti was not prepared to handle another serious incident at the time of the shooting incident at issue in this case.

98. Defendant Persichetti allowed her subjective fear of the circumstances involving the high-speed chase involving Deputy Jenson to overcome her, and she overreacted and used force above and beyond that objectively justified by the circumstances.

99. These actions, and her subjective and unreasonable fears, ultimately led to her discharging her firearm without objective deadly-force justification.

100. The actions and omissions of the Town of LaSalle, and its officers and supervisors, were a moving force behind the constitutional injuries suffered by Mr. Jenson and were a proximate cause of its officer using excessive force in killing Deputy Jenson.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in favor of the Estate of Jesse Jenson, against the Defendant, and award the following:

a. Compensatory damages for the loss of life, lost enjoyment of life, lost companionship, pain and suffering, emotional distress, lost wages, funeral and burial expenses, and other compensable damages associated with wrongful death, in an amount to be determined at trial;

b. Punitive damages against the individual defendant in an amount to be determined at trial;

c. Pre- and post-judgment interest, costs and expert witness fees, reasonable attorney fees by statute, and as allowed by law, and

d. Any other such other relief that the Court deems just and proper.

**PLAINTIFF REQUESTS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Respectfully submitted this 15th day of January 2021.

/s/ Raymond K. Bryant
Raymond K. Bryant, #42586
Civil Rights Litigation Group, PLLC
1543 Champa Street, Suite 400
Denver, CO 80202
Phone: 720-515-6165
Fax: 720-465-1975
raymond@rightslitigation.com


/s/ Steven T. Mandelaris
Mandelaris Law, LLC
501 S. Cherry, Ste. 1100
Denver, CO 80246
Phone: (303) 357-9757
Fax:    (303) 991-9836
stm@mandelarislaw.com

*Attorneys for Plaintiff*

18